1
2
3
4
5
6
7
8
9
10
11                      UNITED STATES DISTRICT COURT

12                      EASTERN DISTRICT OF CALIFORNIA

13

14    ALBERT TREVIZO,                         No.  1:16-cv-01845-DAD-SKO HC

15                   Petitioner,

16         v.                                 **FINDINGS AND RECOMMENDATION
                                              TO DISMISS THE PETITION FOR WRIT
17    DEAN BORDERS, Warden,                    OF HABEAS CORPUS AS UNTIMELY**

18                   Respondent.              **(Doc. 16)**

19

20

21         Petitioner, Albert Trevizo, is a state prisoner proceeding, with counsel, with a petition for

22    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent, Dean Borders, Warden of the

23    California Institution for Men – Chino, moves to dismiss the petition as untimely.  The

24    undersigned agrees that the petition is untimely and recommends that the Court dismiss it.

25

26

27

28
                                              1

# I.    <u>Procedural Background</u>

On August 11, 2004, Petitioner pled no contest to six counts of first degree burglary and admitted three violations of probation. On September 8, 2004, the Tulare County Superior Court ("Superior Court") sentenced Petitioner to a determinate prison term of twenty-six years and four months for the burglaries, and consecutive terms of eight months, two years, and two years and eight months for the three violations of probation. Petitioner's total determinate sentence was thirty-one years and eight months. He did not appeal the judgment.

Petitioner filed several post-conviction collateral challenges to his sentence with the state court. On October 20, 2014, Petitioner filed a petition for writ of habeas corpus with the Superior Court, which was denied on October 31, 2014.

On November 5, 2014,[1] Petitioner filed a petition for resentencing under Proposition 47[2] with the Superior Court for one of his probation violations, which was denied on December 10, 2014. Petitioner filed two more petitions for resentencing under Proposition 47 based on his other two probation violations. Those petitions were granted on December 10, 2014 and January 26, 2015. In one case Petitioner's charge was reduced to a misdemeanor and Petitioner was discharged as to that case. In the second case, Petitioner's charge was reduced to a misdemeanor and the parole period was waived.

On March 2, 2015,[3] Petitioner filed a petition for writ of habeas corpus with the California Court of Appeal ("Court of Appeal"), which was denied on April 23, 2015.

---

[1] Respondent was unable to provide a copy of this filing because the Superior Court clerk could not locate it; therefore, the precise filing date is unknown. (Doc. 27 at 1.) In the petition, Petitioner challenged his sentence based on Proposition Forty-Seven, which had an effective date of November 5, 2014; consequently, the filing could not have been made before November 5, 2014.

[2] California Proposition 47 re-classified some "non-serious, nonviolent crimes" as misdemeanors instead of felonies. Cal. Penal Code § 1170.18 (codifying Cal. Proposition 47).

[3] Petitioner dated this petition February 19, 2015; however the proof of service lists March 2, 2015.

On April 1, 2015,[4] Petitioner filed a petition for writ of habeas corpus with the Superior Court, which was denied on May 14, 2015.

On July 8, 2015, Petitioner filed a petition for writ of habeas corpus with the Superior Court, which was denied on August 5, 2015.

On August 11, 2015, Petitioner filed a petition for writ of habeas corpus with the Court of Appeal, which was denied on October 19, 2015.

On November 1, 2015, Petitioner filed a petition for writ of habeas corpus with the Superior Court, which was denied on November 17, 2015.

On November 1, 2015,[5] Petitioner submitted a petition for writ of habeas corpus with the Superior Court, which was denied on December 17, 2015. On February 29, 2016 Petitioner filed a request to amend his petition for writ of habeas corpus with the Superior Court, which was denied on Mach 10, 2016.

On January 15, 2016,[6] Petitioner filed a petition for writ of habeas corpus with the Court of Appeal, which was denied on February 10, 2016.

On March 28, 2016, Petitioner filed a petition for writ of habeas corpus with the Court of Appeal, which was denied on May 20, 2016.

On June 5, 2016, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court ("Supreme Court"), which was denied on July 20, 2016.

---

[4] The petition contained two proofs of service: one dated April 1, 2015 and the other dated April 30, 2015. It appears that the petition was originally mailed on April 1, 2015, but was never received by the court and was resent on April 30, 2015.

[5] Respondent was unable to obtain a copy of this petition; however, the order denying the petition indicates that Petitioner submitted a photo copy of the previous petition that was denied on November 17, 2015. Therefore, the petition must have been submitted sometime between November 1, 2015 and December 17, 2015, when the Superior Court denied the petition.

[6] This petition is dated November 1, 2015. It does not contain a proof of service, but does include the December 17, 2015 Superior Court denial of Petitioner's petition. It is file-stamped January 15, 2016.

On June 26, 2016, Petitioner filed a petition for resentencing under Proposition 47 for his burglary charges with the Superior Court. It is not clear from the record if this petition was resolved.

On August 8, 2016, Petitioner filed a petition for writ of habeas corpus with the Superior Court, which was denied on August 26, 2016.

On August 26, 2016,[7] Petitioner filed a petition for writ of habeas corpus with the Court of Appeal, which was denied on September 29, 2016.

On October 6, 2016, Petitioner filed a petition for writ of habeas corpus with the Supreme Court, which was denied on November 30, 2016.

On December 8, 2016, Petitioner filed his petition before this Court. On January 3, 2017, the Court granted Petitioner's request for appointment of counsel, because he provided documentation of a hearing impairment and possible developmental disability. (Doc. 8.) Petitioner, through counsel, filed a first amended petition for writ of habeas corpus on August 2, 2017. (Doc. 16.) Respondent moved to dismiss the petition as untimely on December 8, 2017. Petitioner filed an opposition to the motion to dismiss on April 9, 2018 and Respondent filed a reply on May 16, 2018.

## II.     Petitioner's Limitations Period

Respondent contends Petitioner's petition is untimely. Petitioner agrees that the petition is untimely, but alleges he is entitled to equitable tolling.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA provides a one-year period of

---

[7] The proof of service on this petition was dated August 8, 2016; however, the petition attached a copy of the August 26, 2016 order from the Superior Court denying Petitioner's petition for writ of habeas corpus. Consequently, the petition could not have been filed before August 26, 2016.

limitation in which a petitioner may file a petition for writ of habeas corpus.  28 U.S.C. §

2244(d)(1).  The limitations period is measured from the latest of:

> (A)     the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)     the date on which the impediment to filing a State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
>
> (C)     the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)     the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The limitations period is tolled during the time that a "properly filed" application for review is in state court.  § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.")

Here, judgment was entered on September 22, 2004.  The time to seek direct review in California ended on November 21, 2004, when the sixty day period for filing an appeal in the California Court of Appeal expired.  The federal statutory limitations period began on November 22, 2004.  Accordingly, the one-year statutory limitations period expired on November 21, 2005.  Petitioner filed his petition for writ of habeas corpus with this court on December 8, 2016— unless Petitioner is entitled to statutory or equitable tolling, the petition is untimely.

//

//

//

//

5

### III.    Petitioner Is Not Entitled to Equitable Tolling

Petitioner contends he is entitled to equitable tolling based on "cognitive defects," severe hearing loss, and limited access to legal materials.  (Doc. 16 at 14-18.)  Respondent counters that the circumstances described by Petitioner do not justify equitable tolling.  (Doc. 27 at 8.)

#### A.  Standard of Review

The one-year statutory limitations period is intended to protect the federal judicial system from having to address stale claims.  *Guillory v. Roe*, 329 F.3d 1015, 1018 (9th Cir. 2003).  To effectuate that objective, the bar to achieve equitable tolling is set very high.  *Id.*  A habeas petitioner is entitled to equitable tolling of the one-year statute of limitations only if the petitioner shows that (1) he has been pursuing his rights diligently and (2) some extraordinary circumstance prevented timely filing.  *See Holland v. Florida*, 560 U.S. 631, 634, 648 (2010); *Ramirez v. Yates*, 571 F.3d 993, 997 (9th Cir. 2009).  The petitioner bears the burden of alleging facts sufficient to support equitable tolling.  *Pace v. Di Guglielmo*, 544 U.S. 408, 418 (2005).

To satisfy the first prong, the petitioner must demonstrate reasonable diligence.  *Bills v. Clark*, 628 F.3d 1092, 1096 (9th Cir. 2010).  Failure to act diligently throughout the time at issue will break the link of causation between the extraordinary circumstance and the failure to timely pursue relief.  *See Spitsyn v. Moore*, 345 F.3d 796, 802 (9th Cir. 2003) (finding equitable tolling unavailable when the petitioner failed to exercise reasonable diligence under the circumstances that he faced); *Guillory*, 329 F.3d at 1016 (in the absence of diligent effort, extraordinary circumstance did not mandate equitable tolling); *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999) (denying equitable tolling when the petitioner's own conduct rather than external forces accounted for the untimely filing).

"[T]he threshold necessary to trigger equitable tolling under AEDPA is very high, lest the exceptions swallow the rule." *Mendoza v. Carey*, 449 F.3d 1065, 1068 (9th Cir. 2006).  A court

should "permit equitable tolling of AEDPA's limitations period 'only if extraordinary circumstances beyond a prisoner's control make it impossible to file a claim on time.'" *Miles*, 187 F.3d at 1107 (quoting *Calderon v. United States District Court*, 163 F.3d 530, 541 (9th Cir. 1998), *abrogated on other grounds*, *Woodford v. Garceau*, 538 U.S. 202 (2003)). The petitioner must show that an external force caused the petition's untimeliness, not "oversight, miscalculation, or negligence." *Waldon-Ramsey v. Pacholke*, 556 F.3d 1008, 1011 (9th Cir. 2009). A court should determine whether the circumstances are extraordinary using a flexible case-by-case approach, looking for special circumstances that warrant special treatment in an appropriate case. *Holland*, 130 S. Ct. at 2563.

### B. Petitioner Is Not Entitled to Equitable Tolling based on a Cognitive Impairment

Petitioner states he is entitled to equitable tolling due to his "cognitive defects" and hearing loss. (Doc. 16 at 14.)

The Ninth Circuit has held that cognitive impairments may provide a basis for equitable tolling, and has articulated a two-part test for courts to apply:

(1) *First*, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, [ ], by demonstrating the impairment was so severe that either

    a. petitioner was unable rationally or factually to personally understand the need to timely file, or
    b. petitioner's mental state rendered him unable personally to prepare a habeas petition and to effectual its filing.

(2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

To reiterate: the "extraordinary circumstance" of mental impairment can cause an untimely habeas petition at different stages in the process of filing by preventing petitioner from understanding the need to file, effectuating a filing on his own, or finding and utilizing assistance to file. The "totality of the circumstances" inquiry in the second prong considers whether the petitioner's impairment was a but-for

7

cause of any delay. Thus, a petitioner's mental impairment might justify equitable tolling if it interferes with the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure. The petitioner therefore always remains accountable for diligence in pursuing his or her rights.

*Bills v. Clark*, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (internal citation omitted) (emphasis in original).

"The relevant question is: Did the mental impairment cause an untimely filing?" *Id*. at 1100, n. 3 (citing *Spitsyn*, 345 F.3d at 799 (equitable tolling is available if it was "impossible to file a petition on time")); *but see Harris v. Carter*, 515 F.3d 1051, 1055, n.5 (9th Cir. 2008) ("Despite the unequivocal 'impossibility' language in our standard, we have not insisted that it be literally impossible for a petitioner to file a federal habeas petition on time as a condition of granting equitable tolling. We have granted equitable tolling in circumstances where it would have technically been possible for a prisoner to file a petition, but a prisoner would have likely been unable to do so.")).

As noted by the Ninth Circuit:

[i]n practice, then, to evaluate whether a petitioner is entitled to equitable tolling, the district court must: (1) find the petitioner has made a non-frivolous showing that he had a severe mental impairment during the filing period that would entitle him to an evidentiary hearing; (2) determine, after considering the record, whether the petitioner satisfied his burden that he was in fact mentally impaired; (3) determine whether the petitioner's mental impairment made it impossible to timely file on his own; and (4) consider whether the circumstances demonstrate the petitioner was otherwise diligent in attempting to comply with the filing requirements.

*Bills*, 628 F.3d at 1100-01.

Pursuant to *Bills*, this Court must first determine whether Petitioner had a "severe mental impairment" that "would entitle him to an evidentiary hearing." *Id*. An evidentiary hearing is appropriate where a petitioner makes "a good-faith allegation that would, if true, entitle him to equitable tolling." *Laws v. Lamarque*, 351 F.3d 919 (9th Cir. 2003). However, if a record is

8

"amply developed," and "indicates that the petitioner's mental incompetence was not so severe as to cause the untimely filing of his habeas petition, a district court is not obligated to hold evidentiary hearings to further develop the factual record, notwithstanding a petitioner's allegations of mental incompetence." *Roberts v. Marshall*, 627 F.3d 768, 773 (9th Cir. 2010) (citing *Laws*, 351 F.3d at 924 ("Of course, a petitioner's statement, even if sworn, need not convince a court that equitable tolling is justified should countervailing evidence be introduced.").

The Court will summarize the medical evidence from Petitioner's medical records.

### 1. Petitioner's Medical Records

On February 12, 2003, the Central Valley Regional Center[8] ("CVRC") evaluated Petitioner to determine if he was eligible for their services. (Doc. 16-5 at 2.) Petitioner was 22 years old at the time of the evaluation and was described, as follows:

> [Petitioner] has hearing impairment and did not have his hearing aide with him. [Petitioner] was difficult to understand at times. He presented as someone who had delays. He did not always understand what I asked, it was difficult to ascertain if this was due to his hearing loss or other delays. [Petitioner] was previously carried as a [CVRC] client with a [diagnosis] of Unspecified Delay in Development [ ]. . . . Based on the WAIS-III (PIQ: 76)[9] and the TONI-3 (Q score of 77),[10] it was determined that [Petitioner] functioned with borderline non-verbal intelligence; average arithmetic skills and average block design performance. He is not mentally retarded. Nor was he found to have a condition closely related to mental retardation or require treatment similar to that required for mental retarded individuals. [Petitioner] stated that he understood the findings.

*Id*. The CVRC closed his case, but recommended Petitioner for vocational rehabilitation. *Id*.

//

---

[8] The mission of the CVRC "is to help individuals with developmental disabilities and children at risk to reach their goals." CENTRAL VALLEY REGIONAL CENTER, https://www.cvrc.org/cvrc-brochures/. Individuals "who are substantially handicapped due to conditions falling within the legal definitions of 'developmental disability'" qualify for services at the CVRC. *Id*.

[9] The Wechsler Adult Intelligence Scale, III Edition ("WAIS-III") is a standardized test used to measure intelligence. Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L. Rev. 811, 826 (2007). The record does not indicate what a performance IQ ("PIQ") score of 76 means.

[10] The TONI-3 is a Test of Nonverbal Intelligence, 3rd Edition. Case Law Developments, 30 Mental & Physical Disability L. Rep. 678 (2006). The record does not indicate what a Q score of 33 means.

On October 12, 2004, an examination completed in the prison determined that Petitioner is almost deaf in his right ear and to have decreased hearing in his left ear. (Lodged Doc. 33 at 1.) The prison required Petitioner to wear a "hearing impaired vest[,]" but found the disability did "not impact his placement."[11] *Id.* The physicians noted that despite his hearing impairment, they could "converse w[ith] [Petitioner] a little." *Id.* at 4. Petitioner received a passing score on a cognitive test. *Id.* at 2. Petitioner was also found not to be suffering from any mental illnesses. (Lodged Doc. 35 at 2.)

On December 10, 2004, Petitioner was evaluated by prison psychologists and was included in the Disability Placement Program ("DDP"). (Lodged Doc. 33 at 6.) The DDP program includes three placement levels, DD1, DD2, and DD3.[12] *Id.* at 14. The DD1 placement level also includes the D1A level for inmates with the same functional ability as DD1, but who have "victimization concerns." *Id.* at 6. Petitioner was designated as D1A, which is the level for individuals with "mild adaptive functioning deficits." *Id.* at 6, 14.

Pursuant to CDCR's classifications, a DD1 individual:

(1) Does not usually require prompts to initiate/complete self-care and activities of daily living.
(2) May need additional time and coaching to be oriented/trained in new situations and jobs.
(3) May need adaptive supports or additional supervision when under unusual stress or in new situations.
(4) May require help with reading, writing, preparing documentation.
(5) May demonstrate poor understanding of relevant issues during due process events.
(6) May need to be spoken to in slow, simple English with repetition to ensure understanding.

. . .

[11] The California Department of Corrections and Rehabilitations' ("CDCR") classifies inmates who are deaf or hearing impaired, which impacts their placement as "DPH," and inmates with hearing impairments that do not impact their placement as "DNH." (Lodged Doc. 33 at 4.)

[12] A DD1 placement indicates the inmate "[d]oes not usually require prompts to initiate/complete self-care and activities of daily living." (Doc. 16-7 at 2.) DD2 indicates the inmate "[r]equires occasional prompts to initiate/complete self-care and activities of daily living," and a DD3 placement indicates the inmate "[r]equires frequent prompts to initiate/complete self-care and activities of daily living." *Id.*

*Id*. at 14 (emphasis in original).

The prison psychologist noted:

> [Petitioner] reads lips but does not appear to hear any sounds. [Petitioner] is unable to process information verbally or in a written form in a timely fashion. [Petitioner] indicates he does not sign. [Petitioner] consistently misinterprets verbal and written information an[d] is unable to explain material he can repeat. [Petitioner] answers yes to most questions to avoid detection of his lack of understanding. [Petitioner] is a danger to himself and others on the yard. [Petitioner] cannot function on a [general population] yard due to his level of functioning. [Petitioner] needs staff assistance to understand prison rules and functions.

*Id*. at 6.

On December 14, 2004, the psychologist changed Petitioner's classification to DD1, rather than D1A, and noted "[Petitioner] requires on going daily staff assistance for instruction [and] clarification of rules, regulations, appropriate behavior [and] personal requests." *Id*. at 7.

On December 16 and 23, 2004, Petitioner was referred to a mental health professional at the prison based on routine mental health screenings. (Lodged Doc. 35 at 5, 11-12.) However, there is no other information in the file about the referrals.

On March 25, 2005, the psychologist changed Petitioner's classification from DD1 to D1A and restated his findings from the December 10, 2004 evaluation. (Lodged Doc. 33 at 10.) Specifically, the psychologist wrote:

> This [evaluation] is not based on a new CASE evaluation, but is intended to clarify [Petitioner's] DDP status. . . . [Petitioner] reads lips but does not appear to hear any sounds. [Petitioner] is unable to process information verbally or in a written form in a timely fashion. [Petitioner] indicates he does not sign. [Petitioner] consistently misinterprets verbal and written information an[d] is unable to explain material he can repeat. [Petitioner] answers yes to most questions to avoid detection of his lack of understanding. [Petitioner] is a danger to himself and other on the yard. [Petitioner] cannot function on a [general population] yard due to his level of functioning. [Petitioner] needs staff assistance to understand prison rules and functions.

*Id*.

11

1

2          On May 5, 2005, Petitioner was examined as part of a routine intake process after

3   transferring institutions. (Lodged Doc. 36 at 1.) Petitioner stated he was "doing alright," denied

4   any psychiatric problems, suicidal idealization, or hallucinations. *Id*. Petitioner was described as

5   having a pleasant affect, coherent speech, and alert. *Id*.

6          On June 1, 2005, Petitioner requested to be seen by the prison psychiatrist because he was

7   "concern[ed] that he would be moved out of his cell and/or out of the wing." *Id*. at 2. Petitioner

8   stated that he was doing "good," and agreed to talk to a corrections officer if he had any problems

9   with other inmates. *Id*. Petitioner denied any mental health symptoms and none were observed.

10  *Id*.

11

12         During a July 26, 2005 evaluation, Petitioner's classification remained at D1A. (Lodged

13  Doc. 33 at 11.) In updated notes, a prison psychologist found Petitioner needs "assist[ance] in

14  reading [and] writing CDC-form[s]," his interactions with peers needed to be monitored in order

15  to "prevent teasing," and he should only be given one or two step instructions and should be given

16  extra time to complete new tasks. *Id*.

17         On October 20, 2005, Petitioner was seen for his annual review. (Lodged Doc. 36 at 3.)

18  The doctors noted Petitioner "appeared to comprehend [the] proceedings with no difficulty." *Id*.[13]

19

20         On July 4, 2006, Petitioner requested to be seen by a psychiatrist because he was feeling

21  "really depressed and c[ouldn't] sleep at night" due to his mother's recent death. (Doc. 37 at 3.)

22  Petitioner was also hearing his mother's voice at night. *Id*. When Petitioner was examined on

23  July 10, 2006, the psychiatrist noted that Petitioner was "difficult to understand sometimes but

24  able to enunciate questions well w[ith] encouragement." *Id*. at 5. Petitioner was not hallucinating

25

26

27  [13] The Court notes that Petitioner's one-year limitations period expired on November 21, 2005.

28

                                            12

or delusional and his cognition, insight, and judgment were good. *Id*. He was prescribed antidepressants. *Id*.

On August 7, 2006, Petitioner was placed in the mental health treatment population in the Correctional Clinical Case Management System ("CCCMS"). *Id*. at 7. Inmates designated at this level of care are those "whose symptoms are under control or in partial remission and can function in the federal prison population, administrative segregation, or segregated housing units." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 903, n. 24 (E.D. Cal. 2009). During the evaluation, Petitioner reported having auditory hallucinations, problems sleeping, and requested he be designated in the Enhanced Outpatient Program ("EOP"). (Lodged Doc. 37 at 9.) The EOP is for inmates who suffer "acute onset or significant decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment," and who is unable to function in the general prison population, but does not require twenty-four hour nursing care or inpatient hospitalization. *Coleman*, 922 F. Supp. 2d at 903, n. 24.

The mental health evaluation listed Petitioner's Global Assessment of Functioning ("GAF") score, which is a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004). Petitioner's GAF score was recorded as 55, which indicates "serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning." (Lodged Doc. 37 at 7.)

On August 9, 2006, Petitioner's GAF score was listed as 48. *Id*. Petitioner "presented as moderately agitated . . . with the express idea of going to EOP from CCCMS." *Id*. at 23.

Petitioner reported that he was having "difficulties in concentrating and sustaining though which reduces the ability to read or hold a conversation." *Id*. at 21. However, the psychologist noted that Petitioner was alert and cooperative, and had coherent speech and logical content. *Id*. at 21, 26.

On September 6, 2006, Petitioner's GAF score remained at 48. *Id*. at 39. Petitioner continued to report auditory hallucinations and requested to remain in EOP. *Id*. Petitioner's records note that he was diagnosed with major depressive disorder, severe with psychotic features. *Id*. His file, however, also states Petitioner "manipulated his placement[ ] [in EOP] to accommodate being near a lover and apparently [it] is one of the reasons that he is asking for [EOP]." *Id*. at 40 (internal quotation marks omitted). At the time, Petitioner did "not appear to have overt psychotic problems," and it was recommended that he be given 90 days in the EOP program "to evaluate and provide him an appropriate level of care." *Id*. (internal quotation marks omitted). Petitioner demonstrated coherent speech and was "logical at all times exhibiting no overt psychotic s[ymptoms] despite allegations of hearing voices occasionally." *Id*.

On November 9, 2006, Petitioner told his occupational clinician that he wrote to his father at least once a week. *Id*. at 62. He stated that he completed 12th grade attending special education classes, was able to accurately calculate 7 times 8 equals 56, and "display[ed] good reading skills." *Id*. Petitioner was asked what he did during his free time and he stated, "[g]o to yard – work out, play dominoes, talk to people, watch TV, and listen to music." *Id*. When asked if he had acquaintances, he stated, "[y]eah, a little bit of friends." *Id*. at 62-3. The clinician noted that Petitioner gave appropriate "[v]ocal responses." *Id*. at 63. When Petitioner completed a survey, he circled that he had "difficulty following directions, planning ahead, organizing, being responsible, getting things done on time, getting along with others, being patient, feeling good about himself, spelling, setting goals, dealing with stress, planning for parole, with math, with

14

medication side effects, with voices I hear in my head, reading, and understanding directions." *Id*. "He often feels sad, angry, stressed, sleepy, hyperactive, bored, good about himself, and lonely." *Id*.

On November 15, 2006, Petitioner's GAF score was increased to 55 and he was moved from EOP to CCCMS. *Id*. at 64.

On November 17, 2006, it was noted that Petitioner's GAF score increased to 60, indicating moderate symptoms, and he did not display any "overt symptoms of depression of psychosis." *Id*. at 69-70. Petitioner stated he wanted to be transferred from EOP to CCMS, reporting, "EOP has helped me and now I think I will do good in CCCMS. I'm not stressing anymore and I'm feeling better about my mom[,]" who had passed away. *Id*. at 71. At that time, his doctor noted that Petitioner did not "present with overt symptoms of depression for psychosis. Initial level of care change to EOP occurred during his mourning his mother's death." *Id*. at 73.

On November 29, 2006, Petitioner requested to be transferred back to EOP, because people in CCCMS were "stressing [him] out." *Id*. at 77. The doctors chose to have Petitioner remain in CCCMS with "monitoring of current medications and encouragement to participate in therapeutic groups." *Id*.

On October 12, 2011, Petitioner had an annual review before the Classification Committee, where L. Shaw ("Shaw"), a Correctional Counselor, acted as Petitioner's Staff Assistant. (Doc. 16-9 at 2.) The Committee was able to effectively communicate with Petitioner "by using simple English, [and] sp[eaking] loudly and slowly[,] [ ] while maintaining face to face eye contact ensuring [Petitioner] could hear as well as read lips." At the review, "Shaw continuously posed questions to [Petitioner] that would confirm comprehensive communication. In addition, [Petitioner] was frequently asked to explain in his own words that he understood the actions being taken during this committee." *Id*. Petitioner "fully comprehended all matters

presented." *Id.*

On November 20, 2014, Petitioner asked to have his DPH status changed to DNH,[14] because he is "not deaf. I[ ] am hard of hearing only and have a hearing aid." (Lodged Doc. 33 at 12.)

On December 3, 2014, a "Primary Care Provider Progress Note" in Petitioner's medical file listed his score on the Test for Adult Basic Education ("TABE") as 4.0, which is one indicator that Petitioner may have a learning disability. *Id.* at 13; *see Hooker v. Adams*, No. CV-F-04-6584 LJO DLB P., 2008 WL 2788404, at *4 (E.D. Cal. Jul. 18, 2008) (noting that a TABE score of 4.0 or lower is one indicator that a person may have a learning disability). Petitioner was designated DPH and the doctor noted he "spoke loudly during the visit and [Petitioner] understood" him. (Lodged Doc. 33 at 13.)

Petitioner was classified as DD2 on March 4, 2015 after prison staff was concerned about his inability to read or write. (Doc. 16-13 at 2.) DD2 individuals require "occasional prompts to initiate/complete self-care and activities of daily living." (Lodged Doc. 33 at 7.) A DD2 designation is for individuals who have "moderate adaptive functioning deficits," and

(1) Needs additional time and coaching to orient/train in new situations and jobs.
(2) May need help interacting with others, following rules, and avoiding social isolation.
(3) <u>May demonstrate poor understanding of relevant issues during due process events.</u>
(4) <u>May need to be spoken to in slow, simple English with repetition to ensure understanding.</u>
(5) <u>Likely requires help in reading, writing, and preparing documentation.</u>
(6) May have victimization concerns.

*Id.* at 14 (emphasis in original).

---

[14] The California Department of Corrections and Rehabilitations' ("CDCR") classifies inmates who are deaf or hearing impaired, which impacts their placement as "DPH," and inmates with hearing impairments that do not impact their placement as "DNH." (Lodged Doc. 33 at 4.)

At his March 4, 2015 evaluation, Petitioner reported that he was in special education classes during school due to his hearing and speech delays. (Doc. 16-13 at 2.) A psychologist evaluated Petitioner and found:

> [Petitioner] was able to correctly complete [part of a test] with a lot of prompting and reading instructions for him. He needed help spelling words (none, Fresno). He was not able to correctly compute the math problem or the time problem. He was not able to tell the correct time on the clock shown. He was able to read some words in the sentence (an, not, extend, than, the, of). When the sentence was read to him he reported that he did not understand the meaning. He was pleasant, cooperative, and oriented. His mood was anxious. He spoke with [a] speech impairment due to his hearing loss and was difficult to understand at times.

> Due to his cognitive and intellectual impairment and his victimization concerns, he would benefit from adaptive supports offered by the DDP. He will be designated DD2.

*Id.*

During his annual Classification Committee review on March 9, 2016, the Committee found Petitioner "had no difficulty expressing [him]self and confirmed his understanding by explaining in his own words what he had been told." (Doc. 16-12 at 3.)

### 2. Analysis of Petitioner's Medical Records

The Court must ensure that the record regarding Petitioner's mental illness is sufficiently developed to rule on the tolling issue. *See Chick v. Chavez*, 518 Fed. Appx. 567, 568 (9th Cir. 2013) (remanding "for further development of the record as to [petitioner]'s mental competency, and, if necessary, an evidentiary hearing" where record revealed no medical evidence from the time period for which the petitioner sought tolling). Here, the record is sufficiently developed with regard to Petitioner's cognitive impairments for the Court to make a recommendation regarding equitable tolling, as both Petitioner and Respondent have filed Petitioner's medical records for the relevant time period. *See Roberts*, 627 F.3d at 773 (petitioner's "extensive medical records" was an amply developed record upon which district court could find an

evidentiary hearing unnecessary).

Summarizing the medical evidence from the time period between 2004 to 2005, the time period during which a federal habeas petition would have been timely filed, Petitioner's record show that Petitioner suffered from a hearing disability, but was provided a working hearing aid and his doctors noted that they were able to effectively converse with Petitioner. Accommodations were also made to speak slowly and loudly, while looking directly at Petitioner so that he could either hear or read the speaker's lips.

Petitioner was placed in the DDP when he arrived in prison and has remained in the program designated as DD1, D1A, or DD2, indicating that he has between mild and moderate adaptive functioning deficits. During Petitioner's first psychological examination on December 10, 2004, the prison psychologist found that Petitioner "is unable to process information verbally or in a written form in a timely fashion[,]" and he "consistently misinterprets verbal and written information an[d] is unable to explain material he can repeat." (Lodged Doc. 33 at 6). Further, the psychologist found that Petitioner "answers yes to most questions to avoid detection of his lack of understanding." *Id*. Petitioner needed "staff assistance to understand prison rules and functions." *Id*. Petitioner's medical records note that he needs assistance in reading and writing, needs extra time to complete tasks, and should only be given one or two step instructions.

In his opposition to the motion to dismiss, Petitioner focuses on this examination to demonstrate that his cognitive limitations prevented him from being able to timely file his petition for writ of habeas corpus. However, Petitioner passed a cognitive test in October 2004. Petitioner's medical records also indicate that he understood his doctors' and psychologists' medical recommendations. At his medical appointments and during annual prison reviews, the medical professionals and prison officials noted that Petitioner was able comprehend information by repeating back the information they gave him in his own words. Petitioner also understood the

procedures needed to seek medical attention as he submitted several requests to be seen by the medical staff for various reasons.

Petitioner alleges that he was unable to prepare and submit his petition for writ of habeas corpus until December 2014, because he did not have anyone to help him with the forms. (Doc. 16 at 18.) However, throughout his time in prison, Petitioner has been able to submit healthcare request forms regarding his hearing aid (Lodged Doc. 34); request to be seen by prison psychiatrists due to feelings of depression or to discuss his placement within the prison (Lodged Doc. 36); and request a change of status from DPH to DNH (Lodged Doc. 33). Although his medical records indicate that Petitioner needs extra help in reading and writing, given the number of times he interacted with prison staff through his own requests, it is clear that Petitioner has been able to ask for and find help.

Petitioner's TABE score was 4.0, which is one indicator that Petitioner may have a learning disability. (Lodged Doc. 33 at 12.) In California, an inmate with a TABE score of 4.0 or lower must be evaluated for staff assistance of a reasonable accommodation for "effective communication" in prison disciplinary proceedings. 15 Cal. Code Regs § 3000. However, in terms of equitable tolling, low literacy levels are not considered "extraordinary circumstances" that warrant equitable tolling. *See Baker v. Cal. Dep't of Corrs.*, 484 Fed. Appx. 130, 131 (9th Cir. 2012).

Turing to his mental health records, in 2006, Petitioner was diagnosed with major depressive disorder, severe with psychotic features, and during some periods he reported having auditory hallucinations. This diagnosis was made after Petitioner's one year limitations period expired.

From 2006 onward, Petitioner moved between the CCCMS and EOP programs, both of

which are outpatient programs. Petitioner was placed on antidepressants and always found to be coherent and logical. In September 2006, the medical professional believed that Petitioner was manipulating his placement in EOP in order to be near a lover; instead of due to psychiatric problems.

During this time, Petitioner's GAF score fluctuated between 48 to 60, indicating symptoms that varied between serious and moderate.[15] Petitioner's GAF score remained at 48, or in the serious range, for several months between August and November, 2006. Otherwise, Petitioner's GAF score was in the moderate range, which indicates that he was not so impaired by his depression that he could not understand the need to seek habeas relief. *See Davis v. Malfi*, No. CV 06-4744-JVS (JEM), 2015 WL 1383776, at *3 (C.D. Cal. May 27, 2009) (GAF scores between 60 and 70, with two scores of 53 and 55, among the court's reasons for finding no basis for equitable tolling based on mental incompetence); *Sigmon v. Kernan*, No. CV 06-5807 AHM (JWJ), 2009 WL 1514700, at *9 (C.D. Cal. May 27, 2009) (GAF scores between 55 and 66 "indicate only mild to moderate impairment" and do not provide a basis for equitable tolling).

Although Petitioner's mental health changed throughout his time in prison, his behavior and judgment were not affected. *See Orthel v. Yates*, 795 F.3d 935, 941 (9th Cir. 2015) ("Although Orthel grappled periodically with significant mental health issues during his incarceration, the voluminous medical and prison records show that it was not unreasonable for the district court to determine that Orthel was capable of understanding the need to timely file and

---

[15] Petitioner argues "GAF scores are not dispositive and should not be because they are of limited validity and utility. The DSM-V dropped the GAF as an unreliable measurement of mental health functioning, finding that the GAF scale was a poor indicator of detecting change within an individual." (Doc. 33 at 7.) Petitioner states his GAF scores "cannot be considered in isolation from [his] cognitive limitations and severe hearing loss." *Id.* While the Court did not consider Petitioner's GAF score separately from the other evidence, the Court notes that the Ninth Circuit has continued to look to GAF scores as "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Garrison v. Colvin*, 759 F.3d 995, 1003, n.4 (9th Cir. 2014 (finding in the context of a social security disability appeal that GAF scores are relevant to the disability assessment); *see also Dowdy v. Curry*, 617 Fed. Appx. 772 (9th Cir. 2015) (GAF score indicating "only moderate symptoms of impairment" did not support equitable tolling).

effectuate a filing.") (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).  Here the medical records do not show that Petitioner has or had a mental impairment so severe that he was unable to understand the need to timely file a petition or that rendered him unable to file a petition.  Indeed, the records show that Petitioner was moderately impaired by his depression, but he remained cognitively aware and functional.

While Petitioner's medical records indicate that Petitioner required extra help and suffered from depression, his mental health issues were not an extraordinary circumstance given that his record showed he functioned normally in the prison with some accommodations.  By comparison, the Ninth Circuit's decision in *Forbess v. Fanke* illustrates the type of mental impairment that would entitle a petitioner to equitable tolling.  749 F.3d 837 (2014).  In *Forbess*, the petitioner suffered from delusions during the limitations period and "believed he was working undercover for the FBI, and his trial was a 'sham' orchestrated to lure his ex-wife out of hiding and arrest her for being part of an extensive drug distribution operation."  *Id.* at 840.  Petitioner's cognitive impairment falls short of that in *Forbess*.  *See Yow Ming Yeh v. Martel*, 751 F.3d 1075 1078 (9th Cir. 2014) (rejecting an equitable tolling claim where petitioner's mental impairment and allegations were nowhere close to those in *Forbess*).  *Forbess* "reiterates the stringency of the overall equitable tolling test: the mental impairment must be so debilitating that it is the but-for cause of the delay and even in cases of debilitating impairment the petitioner must still demonstrate diligence."  *Yow Ming Yeh*, 751 F.3d at 1078 (citing *Bills*, 628 F.3d at 1100).

Based on the Court's review of Petitioner's medical records, the Court does not find that an evidentiary hearing is required to make a recommendation as to his mental competence.  The record is sufficient to recommend that Petitioner was able to understand the need to file a timely petition for writ of habeas corpus.  Because Petitioner fails to satisfy the first prong of the *Bills* test—to demonstrate that his impairment was so severe that he was unable to file a petition—the

Court recommends dismissing his petition as untimely.

Even if Petitioner satisfied the first prong of the *Bills* test, he is unable to show the second prong, that he diligently pursued his claims "to the extent that he could understand them." *Bills*, 628 F.3d at 1100. Petitioner contends he did not find someone to help him prepare his petition until December 2014. (Doc. 16 at 18.) However, a lack of legal assistance or lack of adequate legal assistance is not grounds for equitable tolling, because there is no right to legal assistance in post-conviction relief. *See Jensen v. Madden*, No. 2:17-cv-1081 GEB AC P, 2017 WL 3069445, at *2 (E.D. Cal. July 19, 2017) (citing *Lawrence v. Florida*, 549 U.S. 327, 336-37 (2007) ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel.").

While Petitioner relied upon a third party to help him file his petition, Petitioner is "personal[ly] responsible [for] complying with the law." *Chaffer v. Prosper*, 592 F.3d 1046, 1049 (9th Cir. 2010) (quoting *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) (internal quotation marks omitted)). Further, Petitioner's simple statement that he could not find someone to help him file his petition is not sufficiently specific to demonstrate diligence. *See Lott v. Mueller*, 304 F.3d 918, 923 (9th Cir. 2002) (equitable tolling determinations "turn[ ] on an examination of detailed facts.").

For the foregoing reasons, the Court recommends the petition for writ of habeas corpus be denied as untimely.

## C. Petitioner is not Entitled to Equitable Tolling Due to the General Delays of Prison Life

Petitioner also alleges that he lacks legal knowledge and was restricted from performing legal research. Allegations that a petitioner lacked legal knowledge do not constitute extraordinary circumstances since nearly all inmates lack legal knowledge and rely on the legal assistance of untrained jailhouse lawyers. *See, e.g., Fisher v. Ramirez-Palmer*, 219 F. Supp. 2d

1076, 1080-81 (E.D. Cal. 2002); *Wilson v. Bennett*, 188 F. Supp. 2d 347, 353-54 (S.D.N.Y. 2002); *Henderson v. Johnson*, 1 F. Supp. 2d 650, 655 (N.D. Tex. 1998). Equitable tolling is not warranted based on a petitioner's lack of understanding of the law. *Chaffer v. Prosper*, 592 F.3d 1046, 1049 (9th Cir. 2010) (finding that the petitioner's *pro se* status, the law library's missing some reporter volumes, and the petitioner's reliance on busy inmate helpers were not extraordinary circumstances "given the vicissitudes of prison life"); *Raspberry v. Garcia*, 448 F.3d 1150, 1154 (9th Cir. 2006) ("[A] pro se petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling"); *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986) (finding *pro se* petitioner's illiteracy and lack of legal knowledge insufficient to justify equitable tolling).

Finally, Petitioner contends he had limited access to his legal materials, the prison law library, and other inmates to assist him because he was housed in the Administrative Segregation Unit ("ASU") for several months. During the one year limitations period, Petitioner was housed in the ASU for five months, from December 14, 2004 to May 13, 2005. (Lodged Doc. 38 at 5.) After leaving the ASU, Petitioner had until November 2005 to file his petition for writ of habeas corpus.

Further, equitable tolling is not warranted due to the delays inherent in prison life, such as lockdowns, inability to obtain relevant legal documents, or physical inability to access the law library, as the law requires petitioners to take the restrictions of prison life into account when calculating the time needed to complete and file a federal petition. *Ramirez*, 571 F.3d at 998 (finding ordinary limitations on access to law library insufficient to warrant equitable tolling); *United States v. Van Poyck*, 980 F. Supp. 1108, 1111 (C.D. Cal. 1997) (finding limitations on law library access due to lockdowns insufficient to merit equitable tolling).

Because the circumstances leading to Petitioner's untimely submission of his habeas

petition were not extraordinary, the undersigned recommends that the Court find that Petitioner is not entitled to equitable tolling of the statute of limitations.

## IV.    Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)  (1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B)  the final order in a proceeding under section 2255.
>
> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that the petition is barred by the statute of limitations to be debatable, wrong, or deserving of encouragement to proceed further. Accordingly, the undersigned recommends that the Court decline to issue a certificate of appealability.

## V.    Conclusion and Recommendation

The undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:    **June 13, 2018**                          /s/ *Sheila K. Oberto*
                                                    UNITED STATES MAGISTRATE JUDGE